Friday, April 22* The Judges delivered, their opinions.
Judge Tucker.
William Fitzkugh of Marmion in K* George county, about the year 1772, put his eldest son John in possession of sundry slaves., which he carried first to Caroline county, and afterwards to Amherst. He some years after sold one of them to Thomas Anderson, and another to Taliaferro. About eighteen months after his removal to Amherst several of them were taken and sold under an execution. John forbade the sale, which took place in 1788. William never brought suit in his life-time for any of them; but by his will dated in March, 1789, and proved in June, 1791, he bequeathed to his son John, “ all the negroes “ which he had hitherto lent hint during his life, and at his “ decease fhe whole of them, and their increase to be equal- “ ly divided between his two eldest sons now living by his “ present wife.” The appellants are those sons, who have brought a suit by their guardian against the purchasers, and their descendants, for those slaves and their increase. There is no evidence in the record that the slaves were given, to John Fitzkugh by his father: on the contrary the evidence of the delivery to him, seems to shew that it was intended by the .father as a loan, only* Some of the. defendants have pleaded the act of limitations: they all insist that they are fair purchasers, The Chancellor was of opi *301 ilion, “ that the father having suffered his son to remain so <~i long in possession of the slaves to his own use, ought to 44 be deemed in a controversy between himself, or volun- “ teers under him, and creditors of the son, or purchasers 44 from him, to have given him the slaves, unless his pos44 session had been under some written act, registered “ within a reasonable time, and in a proper Court shewn 44 to have been fiduciary, or no more than usufructuary, 44 by some written publication in solemn form premonishing 44 people with whom the son should deal, that he was al44 though the visible, not the real owner.” And dismissed the bill with costs, &c. from which deciee tbe complainants have appealed.
The lapse of time between the loan (if in fact it were a loan) of the slaves by the father to the son, being nearly or quite twenty years, the period between the sale of those sold by John Fitzhugh and the father’s death, being equal to that which the act of limitations makes a perpetual bar to the action for the recovery of them by the father; andtha£ which elapsed between the taking them and selling them under execution, and the death of the father, being little short of that which constitutes a bar to such recovery, I strongly incline to approve of the Chancellor’s opinion and decree, throughout. I have no hesitation in thinking it ought to.be affirmed as to those defendants who have pleaded the act of limitations. And upon the principles of public policy and utility, I think it ought to be affirmed as to the others. Five years peaceable possession of a slave will operate as a bar to the recovery by the former owner, unless some express bargain or agreement be proved, shewing that the possession of the holder, is in fact the possession of him who claims the absolute property. If no such proof be adduced the law construes the property to be in him who hath the unqualified possession, for such a length of time. And as to the creditors of the holder who may-have acquired a title under an execution, and as to purchasers either at a public sale under execution, or from *302 the holder himself, an acquiesence in their titles and pos» session thus acquired, seems to me to be a legal bar, and equally one in equity. The gift to the grandsons can have no reference to any period antecedent to the death of William Fitzhugh; for no remainder in a slave could have been created by any verbal gift, made at the time of the delivery to John Fitzhugh, and none is pretended to have been made by deed ; and the devise in the will, I consider, as merely void and ineffectual, after such a long period as intervened in this case. I am therefore in favour of an affirmance of the decree.
Judge Roane.
The first part of the second section of the act of 1785 to prevent frauds and perjuries,(a) in relation to conveyances, &c. to defraud creditors and purchasers, was taken from and intended to be co-extensive with, the English statutes of 13 Eliz. c. 5. and 27 Eliz. c. 4. This is not only evident from comparing it with them, but has also been so decided by the Supreme Court of the United States, in the case of Hamilton v. Russell.(b) In that case the Court, moreover, said, that those acts of Parliament are to be considered as only declaratory of the principles of the common law. The Court of King’s Bench had, previously, in the case of Cadogan v. Kennett,(c) declared that the principles and rules of the common law, as now universally known and understood, are so strong against fraud in every shape, that the common law would have attained every end attained by the said statutes; and that these statutes cannot receive too liberal a construction, or be too much extended in suppression of fraud. It is added, in the same case, that many things are considered as circumstances of fraud; that the statute says not a word about possession; (which is also the case with the clause of our act of Assembly now in question;) but that the law says that, if after a sale of goods the vendor continues in possession, and appears as the visible owner, it is evidence of fraud; because goods pass btj delivery.
*303 It has since been decided in Edwards v. Harben,(a) as well as in the beforcmentioned case of Hamilton v. Russell, (in which our act of 1785 was directly brought into question,) that, unless possession follows and accompanies the deed, such deed is adjudged to be fraudulent; that, in the cace of an absolute and unconditional deed, tliat cannot be said to be the case where possession is retained by the vendor ; and the decision in Cadogan and Kennett is justified in the case of Edwards v. Harben, by considering that the possession was consistent with and accompanied the deed made in that case in favour of the wife.
Both these authorities also shew that, where the deed is absolute, the retaining the possession is per se fraudulent in point of law, and not merely an evidence of fraud.
These cases go to shew that the statutes in question are merely supererogatory in relation to the common law; that the decision respecting the separation of the possession from the title, thus adjudged to be in itself fraudulent, does not result from the terms of the statute, but from the general principles of law ; that the only cases, in which such separation can stand justified, are those in which the possession is consistent with, and called for by, some deed under which the property in question is limited and claimed ; and that the reasons upon which the said statutes are founded cannot be too much extended for the purpose of suppressing fraud. Upon the point of possession also, it will be seen not only, that possessidn is every where considered as the indicium of property in relation to personal goods, but also that the third point resolved in Twine’s case(b) is, “ for that the donor continUcth in possession “ and nseth them” (the goods in question) a as his own,” (as in this case,) “ and by reason thereof, be tradeth and “ trafficketh with others and defrauds and deceives them.”
The general principle arising out of the above decisions, when simplified, is, that an unqualified contract, whereby the possession of goods remains in one man and the right ifi another, is fraudulent; not only for the reason so era *304 phatically expressed, ut supra, from Twine’s case, but also, because, as is above said, in the case of Cadogan v. Kennett, “ goods pass by delivery and, in the case of Hamilton and Russell it will be seen, that' no difference in this respect exists between slaves and other goods.
Is not the above precisely the definition of the case before us ? While the possession exists in the son, does not the right exist in the father ? It existed in him always, because the testimony .does not shew that he lent the negroes to his son for any given time, and therefore might at any time have resumed the property.
While it is agreed that so much of our act as I have just referred to was taken from the two English statutes of Elizabeth, I cannot see that the latter part of the section in question finds any correspondent provision in any English statute. I mean the part respecting the recording of agreements made on consideration not deemed valuable in law, and that respecting goods loaned.
The clause respecting goods loaned is as follows:
“ And in like manner, where any loan of goods or chat- “ tels shall be pretended to have been made to any person, “ with whom, or those claiming under him, possession “ shall have remained by the space of five years, without “ demand made and pursued by due process of law on the “ part of the pretended lender, or where any reservation “ or limitation shall be pretended to have been made of a “use, or property, by way of condition, reversion, re- “ mainder, or otherwise, in goods and chattels, the pos- “ session whereof shall have remained in another as afore- “ &fid, the same shall be taken as to the creditors and “ purchasers of the persons aforesaid so remaining in pos- “ session, to be fraudulent within this act, and that the “ absolute property is with the possession, unless such loan, “ reservation or limitation of use or property were declared “ by will or by deed in writing proved and recorded as “ aforesaid.”
On this clause, which, being posterior to, does not embrace, our case, I will remark, that this provision, or one *305 similar in principle, (however indefinite as to detail or modification,) may, as justly and naturally, be deemed to have resulted from the general principles of law, as that just noticed in relation to the first branch of this section, and was intended to put an end to all future litigation depending upon the point of possession only. Considering that the wide field carved out for perjury and litigation by the indefiniteness of the principle in relation to possession would be productive of much public inconvenience, our act of frauds has improved upon that of England by extending itself into this subject also, and establishing one certain standard in relation to possession in respect of loans. In utility, and in principle, this provision is analogous to that beneficial one in the same act which relates to the sale of lands, marriage-agreements, &c. But I take the law always to have been in this country, and in England., (and which' probably is not changed or affected by the before cited passage from the act of 1785,) that whilst loans of personal goods were permitted, the borrower keeping himself strictly within the pale of his authority in relation thereto, ye$, whensoever he should overstep the limits of his character of borrower, act as owner over them, or sell them, (especially with the knowledge and consent of the lender,) he should be taken to be the owner, in reference to all those who may have been drawn in by these acts to give him credit; and that, in such case, the lender is not to be permitted, by his neutrality and connivance, to aid in the perpetration of a fraud.
In considering this case, therefore, as anterior to the operation of our act; while I do not feel myself at liberty to take, in relation to loans, as bold a ground as is above taken, under the statute of Elizabeth, in relation to conveyanees, namely, that a separation simply, of the possession from the right, for any portion of time, shall be held to be fraudulent, I have no hesitation to say that, if the borrower, with the knowledge and consent of the lender, departs from his true character, and, in the strong and just language in Twiners case, “ useth the goodé as his own, *306 “ and, by reason thereof tradeth and trajpcketh with others, “ and defrauds and deceives them,” the lender and all volunteers under him shall be bound thereby.
As to the facts in the case before us, although Mrs, Fitzhugh and Allison prove William Fitzhugh’s intention to lend the negroes to John Fitzhugh for his life, there is no testimony to shew that, in fact, any co?itract was made to lend them for any determined period. William Fitzhugh had therefore always the right of property in him; and his right of action accrued, if not from the very time of the loan, at least from the time of the sales in question. William Fitzhugh had not postponed his right to demand these negroes until after his son John’s death; and this, perhaps, (for I have not looked into it,) is an answer to the case stated on this point from Vezey. If William Fitzhugh’s right of action accrued, even on the latter event, the plea of the act of limitations is a bar in favour of those who have resorted to it. The case of Grey v. Mendez(a) shews that, when the five years have once commenced, they run over all mesne acts, such as coverture, infancy, &c. but I return to the merits of the case.
It is indeed proved, by some of William Fitzhugh’s overseers and members of his family, that these negroes were only lent; and this was, also, probably known to a few others to whom it was mentioned, and, in some instances, by William Fitzhugh’s desire. On the contrary, several persons residing even in the County of Caroline, where the transaction first originated, (one of them, too, an overseer of John Fitzhugh,) prove that these negroes were considered as John Fitzhugh’s property, that he used them as his own, gained credit upon them, and even sold one of them. This sale being known, it was naturally to be presumed, from his near residence, that his father knew and approved of it, and it may not have been equally notorious, that this sale was by his special leave, and assented to by him with difficulty. The father, therefore, ought to-be bound by the presumption and consequences arising out of this circumstance, Besides, he suffered bis son, *307 without objection, to remove them into a distant County, in which County, as well as in Caroline, he used every act of ownership over them, and gained credit upon them. John Fitzhugh always, both before and after the sale in 1788, spoke of them as his own; and the purchasers at the sale were authorised to consider his conduct at the sale, (which xdso was xvithdrarwn in a conversation with Crawford, who most probably communicated that withdrawal to others,) as a fraudulent attempt to evade the execution. I must not here omit to remark, that John Fitzhugh was the eldest son of an opulent father ; that this provision, ad-mining the property to have been absolutely given, was, probably, but a reasonable advancement to him ; and that, therefore, (and under the general usage in this respect,) the property might naturally and reasonably be taken to have been his own. On the whole, this is a strong case for the purchasers, I cannot differ this claim from one made for the negroes by the father himself; and, if the father himself were before us, no man could hesitate to decree him to abide by the fruits of his own fraudulent cons duct, concealment, or connivance.
On these grounds, I approve of the Chancellor’s decree. But I have formed no opinion (as he seems to have done) as to what act, on the part of a lender, might be proper and sufficient, under circumstances similar to the present, to repel the consequences arising from similar transactions. This is not called for in the present case, and is the less necessary to be settled by the Court as a general regulation, in consequence of the provision before mentioned, as introduced into the act of 1785, in relation to loans.
Judge Fleming.
This appears to be a very plain case. The reasons given by the Chancellor for dismissing the bill are too cogent to be gotten over. John FitzhugWs long uninterrupted possession of the slaves afforded a strong-presumption that they were his own property, upon the strength of which he obtained extensive credits. The, *308 knowledge that he had received them from his father o* loan, was confined solely to the family of Fitzkugh; and the great distance to which he removed from his father’s dwelling, rendered it next to a miracle that the circumstance could have been known to others. The dangerous and pernicious consequence of giving countenance to such claims as this, is too obvious to need a comment. I therefore concur in opinion, that the decree dismissing the plaintiff’s bill be affirmed.
By the whole Court, (absent Judge Lyons,) the decree of the Superior Court of Chancery, dismissing the complainant’s bill, Was AfFIKIEl).

 Rev. Code, 1 vol. p.15, 16.

 1 Cranch. 309.

 Cowp.434.

 2 Term Rep. 594.

 3 Co. Rep. 80.

 1 Str. 556.